UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ AUG 1 0 2017 ★

BROOKLYN OFFICE

-------------------------------------------------------------------------x
J.R., a minor with a disability by his parents J.R. and S.F.R.,
and J.R. and S.F.R., individually,

                Plaintiffs,

    -against-

The New York City Department of Education,

                Defendant.
-------------------------------------------------------------------------x

**MEMORANDUM AND
ORDER**

15-CV-364 (SLT) (RML)

**TOWNES, United States District Judge:**

Plaintiffs S.F.R. ("S.F.R.") and J.R. (collectively, "Plaintiffs"), the parents of J.R.

("J.R."), by and through their attorney, move for summary judgment under Federal Rule of Civil

Procedure 56 arguing that Defendant the New York City Department of Education's

("Defendant") educational plan for J.R. for the 2013-14 school year violated the Individuals with

Disabilities Education Improvement Act ("IDEA"), 20 U.S.C. §§ 1400 *et seq.*, and therefore,

Defendant should be ordered to reimburse Plaintiffs for any tuition that they paid for J.R. to

attend a private school, the Winston School, for the 2013-14 school year, and to pay the Winston

School any outstanding amount for such tuition. (ECF No. 19.) Defendant has cross-moved for

summary judgment seeking dismissal of Plaintiffs' claims on the grounds that Defendant's

educational plan for J.R. for the 2013-14 school year satisfied the IDEA's requirements. (ECF

No. 23.) For the reasons set forth herein, Plaintiffs' motion is denied and Defendant's cross-

motion is granted.

## STATUTORY AND REGULATORY FRAMEWORK

Any state that receives IDEA funding must provide all disabled children with a "free

appropriate public education ["FAPE"]." 20 U.S.C. § 1412(a)(1)(A). The IDEA defines FAPE to

mean[] special education and related services that—

(A) have been provided at public expense, under public supervision and direction, and without charge;

(B) meet the standards of the State educational agency;

(C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and

(D) are provided in conformity with the individualized education program required under section 1414(d) of this title.

20 U.S.C. § 1401(9). "The term 'special education' means specially designed instruction, at no

cost to parents, to meet the unique needs of a child with a disability ...." 20 U.S.C. § 1401(29).

"The term 'related services' means:

transportation, and such developmental, corrective, and other supportive services (including speech-language pathology and audiology services, interpreting services, psychological services, physical and occupational therapy, recreation, including therapeutic recreation, social work services, school nurse services designed to enable a child with a disability to receive a free appropriate public education as described in the individualized education program of the child, counseling services, including rehabilitation counseling, orientation and mobility services, and medical services, except that such medical services shall be for diagnostic and evaluation purposes only) as may be required to assist a child with a disability to benefit from special education, and includes the early identification and assessment of disabling conditions in children.

20 U.S.C. § 1401(26).

The state education agency formulates "an individualized education program ("IEP")" for

each disabled child. *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176,

181 (1982). The IEP is a written document that sets forth "special education and related

services" that should be "tailored to meet the unique needs of a particular child, and reasonably

calculated to enable the child to receive educational benefits." *C.F. v. N.Y.C. Dep't of Educ.*, 746

2

F.3d 68, 72 (2d Cir. 2014) (internal quotation marks and citation omitted).  The IEP should include at least the following:

> (I) a statement of the child's present levels of academic achievement and functional performance …; (II) a statement of measurable annual goals, including academic and functional goals …; (III) a description of how the child's progress toward meeting the annual goals described in subclause (II) will be measured and when periodic reports on the progress the child is making toward meeting the annual goals (such as through the use of quarterly or other periodic reports, concurrent with the issuance of report cards) will be provided; (IV) a statement of the special education and related services and supplementary aids and services, based on peer-reviewed research to the extent practicable, to be provided to the child, or on behalf of the child, and a statement of the program modifications or supports for school personnel that will be provided for the child …; (V) an explanation of the extent, if any, to which the child will not participate with nondisabled children in the regular class and in the activities described in subclause (IV)(cc) ….

20 U.S.C. § 1414(d)(1)(A)(i).  The IEP should also recommend placement in the least restrictive environment ("LRE"), meaning that "removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily."  20 U.S.C. § 1412(a)(5)(A).  The IEP should be reviewed "periodically, but not less frequently than annually …."  20 U.S.C. § 1414(d)(4)(A).

New York State has assigned responsibility of developing an IEP to local Committees on Special Education ("CSE").  N.Y. EDUC. L. § 4402(1)(b)(1).  A CSE is composed of members appointed by the local school district's board of education and should include the child's parent(s), a school board representative, a regular or special education teacher, and anyone else with "knowledge or special expertise regarding the student …."  *Id.* at § 4402(1)(b)(1)(a).  New York provides that the CSE must consider the following in formulating an IEP: "(1) academic achievement and learning characteristics, (2) social development, (3) physical development, and

3

(4) managerial or behavioral needs.[1]" N.Y. COMP. CODES RULES & REGS. TIT. 8 § 200.1(ww)(3)(i)(d).

"New York parents who disagree with their child's IEP may challenge it in an 'impartial due process hearing,' 20 U.S.C. § 1415(f), before an IHO [impartial hearing officer] appointed by the local board of education, see N.Y. Educ. Law § 4404(1). The resulting decision may be appealed to an SRO [state review officer], see N.Y. Educ. Law § 4404(2); see also 20 U.S.C. § 1415(g), and the SRO's decision in turn may be challenged in either state or federal court, see 20 U.S.C. § 1415(i)(2)(A)." *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 108 (2d Cir. 2007).

Parents must exhaust the administrative review process before raising IDEA claims in a state or federal lawsuit. *Cave v. East Meadow Union Free Sch. Distr.*, 514 F.3d 240, 245 (2d Cir. 2008) (citing 20 U.S.C. § 1415(i)(2)(A)). "Failure to exhaust the administrative remedies deprives the court of subject matter jurisdiction." *Id.* (citations omitted).

The IDEA also provides that "during the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the parents otherwise agree, the child shall remain in the then-current educational placement of the child ...." 20 U.S.C. § 1415(j). Section 1415(j) is commonly referred to as the pendency provision. A party need not administratively exhaust a claim alleging violation of the pendency provision. *Murphy*, 297 F.3d at 199-200; *Doe v. East Lyme Bd. of Educ.*, 790 F.3d 440, 455 (2d Cir. 2015).

---

[1] "[M]anagement needs which shall mean the nature and degree to which environmental modifications and human or material resources are required to enable the student to benefit from instructions." N.Y. COMP. CODES RULES & REGS. TIT. 8 § 200.1(ww)(3)(i)(d).

## FACTS

The administrative record reveals the following facts.

### A. J.R.'s Background

J.R. was 13 years old when the IEP at issue in this litigation was developed in June 2013. (Admin. Rec.[2] IHO Findings of Fact and Decision 3.) It is undisputed that J.R. has speech and language impairments as classified under the IDEA. (*Id.*) He attended a private school for kindergarten and first grade, but had to repeat the first grade due to poor performance. (Admin. Rec. Def. Ex.[3] 2 at 2.) He subsequently attended another private school but instead of entering the second grade, that school placed him in the third grade so that he would be in class with students of the same age. (*Id.*) But he was held back again. (*Id.*) The school principal suggested that J.R. be evaluated to determine the proper placement for him. (*Id.*) That evaluation revealed that J.R. needed a special education placement and he was thereafter enrolled in the West End Day School ("WEDS"), a private school. (*Id.*)

After attending WEDS for three years, J.R. aged out of the school. Accordingly, a CSE convened on June 3, 2013, to formulate a program and placement for him for the 2013-14 school year. In preparation for that CSE meeting, the reports that are discussed below (**A.1-A.3** *infra*) were prepared and available to the CSE before the CSE deliberated on June 3, 2013. None of the information in these reports is disputed.

---

[2]  "Admin. Rec." refers to the sealed record that the Court received of the underlying administrative proceedings, which includes documents introduced by both parties during the administrative proceedings, a transcript of the hearings held in front of the IHO on March 19, June 9, and July 10, 2014 ("Tr."), the IHO's Findings of Fact and Decision, and the SRO Decision. (ECF No. 30.)

[3]  "Def. Ex." refers to any Exhibit introduced by Defendant in the underlying due process proceedings.

## 1.    WEDS

J.R. attended WEDS for three years.  (*Id.*)  Defendant financed J.R.'s tuition to attend

WEDS.  (Admin. Rec. Pls. Ex. A at ¶¶ 11-14.)

WEDS provided progress reports for J.R. dated March 28, 2013, and May 29 and 31,

2013.  (Admin. Rec. Def. Ex. 4.)  At WEDS, J.R. was in a 7:1+2 classroom, which means that he

was in a seven student classroom with one teacher and two aides, and in smaller classrooms for

Reading and Math.  (Admin. Rec. Def. Ex. 3.)  He received "receptive[4] and expressive language[5]

therapy" twice a week in class and an individual session for 30 minutes once a week with a

speech-language ("S/L") pathologist.  (*Id.* at WEDS Speech and Language: Goals and Objectives

report.)

J.R.'s head teacher at WEDS, Naomi Fair, noted that he "struggles a great deal with both

expressive and receptive language.  As a result, he tends to be very hesitant to participate in

social and academic discussions."  (Admin. Rec. Def. Ex. 4 at report dated March 28, 2013.)

Fair recommended "a 12-month therapeutic special education setting."  (*Id.*)  She also noted that

he "requires consistent individualized attention in order to address his many academic needs.

One-on-one time with the teacher is <u>crucial</u> to his ability to participate fully in his academic

groups, as he struggles to process new information, skills, and abstract concepts."  (*Id.*)

The S/L pathologist, Alyson Feldman, noted that J.R.'s "annual goals address receptive

and expressive language, pragmatic language [social skills], executive functioning skills ....

---

[4]    "Receptive language issues involve difficulty understanding what others are saying."
http://www.readingrockets.org/helping/target/phonologicalphonemic

[5]    "Expressive language is the use of words, sentences, gestures and writing to convey meaning and messages to
others."  https://childdevelopment.com.au/areas-of-concern/using-speech/expressive-language-using-words-
and-language/

[and] phonological awareness skills ...."[6] (Admin. Rec. Def. Ex. 4 at WEDS Speech and Language: Goals and Objectives report.) Feldman also noted that he "requires repetition of directives[,]" and "benefits from check-ins ." (*Id.*) "Overall, [J.R.] ... has been showing academic and social growth as a result of the small, structured environment of his classroom and continues to require the support that he is being provided by his teachers and specialists." (*Id.*) She also recommended that he "continue to receive speech and language therapy ... times per week[7] in individual and small groups to address his specific language difficulties." (*Id.*)

A WEDS social worker, Emma Yovanoff, noted that J.R. "struggles with depression, slow processing, and learning and language delays that have affected his social and academic progress.... [J.R.] benefits greatly from visual aids and having information broken down." (Admin. Rec. Def. Ex. 4 at WEDS Progress Report.) Yovanoff further noted that he "continues to need a small learning environment supported by individual attention that can address his academic and emotional needs." (*Id.*) All of the WEDS reports are consistent with each other. None recommends a specific class size for J.R.

### 2. Mount Sinai Psychoeducational Evaluation report

On March 19 and 20, 2013, the Learning and Development Center at Mount Sinai Hospital ("Mt. Sinai") evaluated J.R. and developed a Psychoeducational Evaluation report to better understand J.R.'s strengths and weaknesses and recommend the "appropriate interventions" by his educators and Plaintiffs. (Admin. Rec. Def. Ex. 2 "Psychoeduc. Eval.".)

---

[6] "Phonological awareness is a broad skill that includes identifying and manipulating units of oral language – parts such as words, syllables, and onsets and rimes. Children who have phonological awareness are able to identify and make oral rhymes, can clap out the number of syllables in a word, and can recognize words with the same initial sounds like 'money' and 'mother.'"
http://www.readingrockets.org/helping/target/phonologicalphonemic

[7] The copy of this page that is part of the sealed record has smudged the word that follows "speech and language therapy"; that word is illegible.

The report was prepared by an Assistant Professor at Mt. Sinai's School of Medicine who has a Ph.D., and an extern at that School of Medicine who has a Master's degree in Science. (*Id.* at 11.)

The Psychoeducational Evaluation reported that J.R.'s verbal abilities and language skills were below age expectations. His visual-motor and visual-perceptions skills ranged from borderline to average. His verbal working memory capacity was within the borderline range. His mental processing speed was in the low average range. His academic functioning "fell in the borderline range, his reading skills were significantly below the expected levels for his age." "His reading comprehension score was appropriate for his grade level, and he read with a speed appropriate for his grade level." His written language skills "rang[ed] from borderline to average. His spelling skills were mildly delayed and at a second grade level. [He also] evidence[s] extreme difficulty [with] construct[ing] original sentences.... Overall [his] writing skills improve when he is provided with structure." His math performance ranged "from low average to average." His IQ score indicates an "overall cognitive functioning" level in the borderline range. And the "clinical interview" revealed that J.R. is a "rigid thinker with difficulty regulating his emotions." (*Id.* at 5-7.)

The Psychoeducational Evaluation also reported that his special education teacher at WEDS noted that his learning problems are in the "at-risk range[;]" that he "has difficulty understanding and completing his schoolwork[;]" that he has issues with withdrawal symptoms and "functional communication" problems that were in the "clinically significant range[;]" and that '[t]hese findings suggest that [J.R.] is frequently alone and may have difficulty making friends, as well as poor expressive and receptive communication skills that impede on his ability to have social conversations or find information on his own." (*Id.* at 8.) S.F.R. reported to Mt.

Sinai that J.R. used to be enrolled in sports but "the noise and competition overwhelmed and upset him." (*Id.* at 3.) The report does not specify when J.R. was enrolled in sports or when he dropped out.

Moreover, J.R.'s "self-report" indicated "low confidence in his ability to make decisions, solve problems, and depend on himself." He does not show signs of depression however. (*Id.* at 8.)

Consistent with the WEDS Progress Report (Admin. Rec. Def. Ex. 4), Mt. Sinai recommended "intensive, individualized support as found in small, special education programs." No specific class size was recommended. The report also noted that J.R.'s "verbal comprehension skills fell in the borderline range, whereas his nonverbal abilities were a relative strength for him. Therefore, he would likely benefit from the following accommodations" in school:

- "utilize visual cues to reiterate instructions and routines" like "diagrams or pictures" rather than "relying on memorizing material verbally[;]"

- "provide structure for all academic activities including specific visual directions and a formal routine for tasks[;]"

- "present[] [material] in small segments with breaks interspersed. Similarly, directions should be concise and illustrated with pictures[;]"

- "check-in for understanding after instructions have been given or materials has been taught[;]"

- give him "skeleton notes for lecture-based classes where he can fill in the details[;]"

- give him "study guides and outlines" to help him digest and "organiz[e] large amounts of information and determine key concepts that are of importance when studying for exams[;]"

- "foster his independence," by having him "keep visual schedules and to-do lists[;]"

- consider that as he ages "and his schedule grows more complex," to "provide him with a visual schedule in order to prepare him for his day and to let him know what is expected of him on any given day[;]" and

- let him "over-learn[] skills as another way to encourage his independent functioning in the classroom."

(*Id.* at 9.) Mt. Sinai also suggested "weekly counseling sessions at school in order to help him learn to utilize coping skills when" he gets nervous, especially for "test and performance related anxiety." (*Id.* at 11.)

### 3. Social History Update

In preparation for the June 3, 2013 CSE meeting, on May 13, 2013, a social worker who works for Defendant met with S.F.R., J.R.'s mother, to gather information that was compiled in a document titled Social History Update. (Admin. Rec. Def. Ex. 3.) The social worker noted that S.F.R. "is looking for a school setting that can tailor the curriculum to meet [J.R.'s] needs and to help him work on his independent living skills." (*Id.*) S.F.R. told the social worker that:

- she wants J.R. "to continue with speech and language therapy and counseling[;]"

- although he was progressing at WEDS, he was still struggling academically and was shy; and

- she was visiting private schools to find an appropriate placement.

(*Id.*)

### B. The June 3, 2013 CSE Meeting and the IEP for the 2013-14 School Year

On June 3, 2013, the CSE met to formulate an IEP for J.R.'s 2013-14 school year. (Tr.[8] at 270.) The WEDS reports, the Mt. Sinai Psychoeducational Evaluation report, and the Social History Update were all available to the CSE. (Tr. at 29.) The following individuals attended the CSE meeting in person: Nesson O'Sullivan, Defendant's school psychologist who also

---

[8]  "Tr." refers to the sealed transcript filed in this case of the testimony given during the due process hearings on March 19, June 9, and July 10, 2014. (ECF No. 30.)

chaired the CSE meeting and served as Defendant's representative on the CSE, Judy Sommers, a special education teacher who also worked for Defendant, Plaintiffs, Marie Wise, another parent who served as a CSE member, and Pearl Dresdner, a parent advocate for Plaintiffs. (Admin. Rec. Def. Ex. 1 ("IEP").) The three individuals who signed (and presumably prepared) the WEDS progress reports, Fair, the head teacher, Feldman, the social worker, and Yovanoff, the S/L pathologist (collective, the "WEDS members"), participated in the CSE meeting by telephone. (*Id.*) Fair drafted the 2013-14 IEP. (Tr. at 96.)

J.R.'s IEP for the 2013-14 school year begins with a description of his "Present Levels of Performance and Individual Needs[.]" That section summarized the Mt. Sinai testing results as set forth in the Psychoeducational Evaluation report. (IEP 1.) It also noted that he would be going into the sixth grade and that "[s]chool reports that with structure and support ... [J.R.] is reading at a 4th grade level and doing math at a 4th grade level[.]" (*Id.*) Consistent with the WEDS and Psychoeducational Evaluation reports, the IEP noted that J.R.

> needs directions carefully explained to him. He continues to have difficulty identifying the main idea of paragraphs and summarizing what has been read. [He] struggles to identify rhyming pair [*sic*] of single words [he] continues to have some difficulty with phonological processing skills/ In reading [he] tends to guess how words are pronounced based on the first letter. He does not sound them thoroughly through. [He] expressively [*sic*] language is somewhat immature with and lacking in an age appropriate complexity both grammatically and thematically The language of math and multi step problems continue to present difficulty for him. The writing process is slow and laborious He has difficulty applying grammar rules and he can become confused as to how to organize his thoughts on paper.

(*Id.*) The IEP also listed the following teaching methods as his "Management Needs[:]"

> Visual Prompts and Schedules
> Structured presentation of task
> Curriculum presented in segmented chunks
> Directions should be concise and presented with accompanying visuals
> Skeleton notes to combat slowed processing

(*Id.* at 2.) All five teaching methods mirror the recommended "accommodations" in J.R.'s Psychoeducational Evaluation report. (Psychoeduc. Eval. 9.) The IEP also noted that his "[l]anguage and academic delays preclude placement in a general education setting at this time." (IEP 2.) The IEP listed five pages of "Measurable Annual Goals" and what instruction methods were recommended to help him achieve each of the goals. (*Id.* at 3-8.) The Annual Goals mirror the issues raised in the WEDS and Psychoeducational Evaluation reports – increase self-esteem, improve his reading comprehension skills, improve his speaking skills, and improve his writing skills. (*Id.*) Plaintiffs have no dispute with the portions of the IEP that discuss J.R.'s academic needs, his Management Needs, and his Measurable Annual Goals.

The IEP "recommended [the following] Special Education Programs and Services" for J.R.:

- a 12:1+1 special education classroom in a "community school"[9], meaning J.R. would be in a classroom with 11 other students, one special education teacher, and one paraprofessional

- individual S/L therapy for 40 minutes twice a week

- S/L therapy in a group of three students for 40 minutes twice a week.

- individual counseling for 40 minutes once a week

- counseling in a group of three students for 40 minutes twice a week

---

[9] In Defendant's school system, "[a] Community School is a partnership between school staff, families, youth, and the community to raise student achievement by ensuring that children are physically, emotionally, and socially prepared to learn. A Community School serves as a center of the neighborhood by providing access to critical programs and services like health care, mentoring, expanded learning programs, adult education, and other services that support the whole child, engage families, and strengthen the entire community. In the NYC Community School approach, each school is paired with a lead Community Based Organization (CBO) partner that works collaboratively with the principal and the School Leadership Team (SLT) to carry out the work at the school." http://www1.nyc.gov/site/communityschools/about/about.page

(*Id.* at 8-9.) The recommended related services are consistent with the services that J.R. received at WEDS, albeit in a smaller classroom. The IEP also recommended testing accommodations. (*Id.* at 9-10.)

Under "Parent Concerns[,]" the IEP only vaguely noted that the "[p]arents are [in] agreement with a community school bases self contained special class but are apprehensive that recommended program will fully meet his educational needs. they are willing to look at any offered program." (*Id.* at 12.) The IEP also noted that "[i]ntegrated co-teaching[10] was discussed and dismissed as not providing sufficient academic support. 12:1:1 Special Class in a Specialized School[11] was discussed and dismissed as being overly restrictive." (*Id.*)

On August 2, 2013, Defendant mailed to Plaintiffs the Final Notice of Recommendation for the 2013-14 School Year which listed the IEP's recommended program and placement for J.R.. (Admin. Rec. Def. Ex. 10.) None of the boxes to mark whether Plaintiffs consent or not to the recommended program and placement are marked, nor did Plaintiffs sign or date this document. (*Id.*)

## C.    Beginning in Fall 2013, J.R. Attends the Winston School

On September 1, 2013, S.F.R. enrolled J.R. at the Winston School for the 2013-14 school year. (Tr. at 276; Admin. Rec. Pls. Ex. C.) Plaintiffs paid a down payment of $500 towards his tuition and the rest of his tuition, $52,510, for the 2013-14 school year remains outstanding. (Tr. at 314-15.)

---

[10]    "Students with disabilities who receive Integrated Co-Teaching services are educated with age appropriate peers in the general education classroom. ICT provides students the opportunity to be educated alongside their non-disabled peers with the full or part-time support of a special education teacher to assist in adapting and modifying instruction." http://www.uft.org/teaching/integrated-co-teaching-ict

[11]    Neither party has informed the Court what a "Specialized School" means in this context. Based on context, the Court assumes that it means a school for special needs children.

J.R. started in the seventh grade at the Winston School in a 12:1 classroom. He received one-on-one instruction daily for 45 minutes (Focus class), S/L therapy, and counseling. (Social History Update).

The Winston School issued progress reports for the Fall 2013 and Winter 2014 semesters, as well as for the entire 2013-14 school year, that discuss J.R.'s educational needs, his test results, his educational goals for that school year, and his progress in each class. (Admin. Rec. Pls. Ex. E, F, L.) The School developed his goals by reviewing his "most recent neuropsychological evaluation, initial observations, and formal and informal assessments at Winston …." (Pls. Ex. E.) Based on "[p]revious assessments, both formal and informal," the Winston School noted that J.R. needed to improve in the following areas: "receptive and expressive language, working memory, processing speed, and executive functioning." (*Id.*) Consequently, J.R's Focus class at the Winston School targeted his expressive and receptive language skills by practicing reading and writing. (*Id.*) At WEDS, J.R. received small group and individual S/L therapy sessions to target the same skills. (WEDS Speech and Language: Goals and Objectives report.)

J.R.'s report card for the 2013-14 school year at the Winston School showed:

- Literature: B+ in the Fall semester; A- in the Winter semester
- Writing: B+ in the Fall semester; B+ in the Winter semester
- Math: A in the Fall semester; A+ in the Winter semester
- History: A- in the Fall and Winter semesters
- Science: B+ in the Fall and Winter semesters
- Focus: A- in the Fall semester; A in the Winter semester
- Art: A- in the Winter semester
- Music: A- in the Fall and Winter semesters
- Physical Ed.: A- in the Fall semester

(Admin. Rec. Pls. Ex. K.)

## D.    The Due Process Proceedings

### 1.    The Due Process Complaint

On December 9, 2013, Plaintiffs submitted a due process complaint to the local school seeking an impartial hearing to contest J.R.'s IEP for the 2013-14 school year. (Admin. Rec. Pls. Ex.[12] A "Due Process Compl.".) Plaintiffs argued that the IEP was procedurally defective for "not providing a timely program and placement" for the 2013-14 school year and "not giving the parent sufficient notice to visit the placement site, as is the parents' right, prior to the beginning of the school year." (*Id.* at ¶ 25.)

As to substantive defect, Plaintiffs' argument was vague. They argued that during the June 3, 2013 CSE meeting, they "informed the CSE that [J.R.] was in a 5:1 program [at WEDS] and nevertheless continued to struggle. While he made some progress in various areas the degree of progress does not support a conclusion that the substantially different program proposed by the CSE is likely to produce appropriate gains." (*Id.* at ¶ 18.) Plaintiffs further argued that in a letter that S.F.R. faxed on or around August 13, 2013, she told either the CSE or the local school that Plaintiffs would enroll J.R. at the Winston School beginning in September 2013 and would seek tuition reimbursement from Defendant. (*Id.* at ¶ 22.) Plaintiffs argued that Defendant should pay for J.R.'s tuition at the Winston School for the 2013-14 school year (¶ 52) because: the Winston School met J.R.'s "learning needs" in the least restrictive environment; he should be attending private school; he needs "related services, speech and language therapy and counseling[,]" and Plaintiffs fully cooperated in the CSE meeting and, therefore, the equities weigh in their favor. (*Id.* at ¶¶ 31-7, 47, 50.)

---

[12]    "Pls. Ex." refers to any Exhibit introduced by Plaintiffs in the underlying due process proceedings.

## 2. The Due Process Hearings

The IHO held due process hearings on Plaintiffs' case over three days-March 19, June 9, and July 10, 2014. (IHO Findings of Facts and Decision 1.) The IHO heard testimony from four witnesses who answered questions from attorneys for both parties. None of the witnesses dispute that J.R. needs a small and structured learning environment with consistent individual support.

### a. Nesson O'Sullivan

Nesson O'Sullivan was the first witness to testify at the hearing. O'Sullivan is certified as a school psychologist in New York State and has worked for Defendant for 28 years. He has a bachelor's degree in psychology and a master's degree in applied school psychology. His job is to serve on a CSE, conduct evaluations, "functional behavior assessments and prepar[e] individual education plans for children who ...do not attend public schools." (Tr. at 27-8.)

He is familiar with J.R.'s profile because he chaired the June 3, 2013 CSE meeting and participated in a previous CSE meeting to formulate J.R.'s IEP for the previous school year. In preparation for the June 3, 2013 CSE meeting, the CSE collected evaluative information from WEDS, had a school social worker who works for Defendant meet with Plaintiffs to "conduct a social history update[,]" and received from Plaintiffs an evaluation of J.R. done by Mt. Sinai. (*Id.* at 29-31.) O'Sullivan testified that based on his review of the evaluative information, J.R. is "well related and cooperative" with "below average intelligence on a formal scale[,]" with "academics [that] are weaker than they should" for someone going into the sixth grade, and someone who has difficulty with social situations. (Tr. at 33-4.)

O'Sullivan also testified that the CSE arrived at the recommended placement and program based on the Psychoeducational Evaluation and the WEDS reports, and input from the

WEDS members. Specifically, the CSE relied on the Psychoeducational Evaluation report's recommended "accommodations" to formulate J.R.'s Management Needs, which include "visual prompts" and "visual schedules" presented in a "structured manner" to address his "auditory processing" issues with instructions given to him clearly with "accompanying visuals[,]" and "skeleton notes" to address J.R.'s "low processing" issues. All the Management Needs were "corroborated verbally by the staff of West End Day, in the presence of the Parent" during the CSE meeting. (*Id.* at 39-42.)

The CSE formulated J.R.'s Annual Goals by getting "agreement that a particular area of deficit should be covered" and addressing what type of goal would cover that deficit. Again, the CSE "developed [these goals] from the information that came from the psychological [*sic*] evaluation, from the [WEDS] progress reports, and confirmed with the verbal accounts by the [WEDS] teachers." Everyone participated in this discussion-"the Parents, the advocate, the teachers, the service providers …. [E]ach goal addressed were collaboratively identified and addressed." (*Id.* at 42-4.) O'Sullivan gave "[a] lot of significance" to the opinion of the WEDS members because they "had direct experience with the child, detailed, ongoing professional experience." (*Id.* at 80.)

According to O'Sullivan, the CSE recommended a 12:1+1 classroom in a public community school because

> we were cognizant of Joseph's challenges in a variety of academic areas: language, math and writing and reading. And we wanted to provide enough special education support, enough adult attention throughout the day to - in order that - to - in order - the goals that we had identified, in order that they could be properly addressed. So, we did want a full time, small, special class for that purpose.
>
> We - we wanted a paraprofessional in class, to help with - help Joseph really with accessing the - the lesson being taught, the activities of the classroom, implementing some of the visual prompting and some of the other – the chunking types of aspects of the classroom environment that we had felt would

> facilitate Joseph's learning. So, the paraprofessional would assist with making the - the lesson more accessible for - for Joseph.
>
> By the same token, we didn't want too few children in the - in the classroom, as [J.R.] was not presenting with significant interfering behaviors and did need a certain social forum both to enhance his language, but also to enhance his - his self-esteem and his self-advocacy or self-assertion with his - with his community, which are other - which really is other kids his age.

(*Id.* at 50-2.) O'Sullivan testified that related services were recommended to ensure that J.R. would receive individual attention. The CSE recommended individual counseling services to address J.R.'s "sadness, lowered self-esteem" and small-group counseling sessions to improve his "interpersonal" skills. It recommended S/L therapy to improve J.R.'s "receptive and expressive language and in the phonological aspects of language as they relate to reading." It recommended testing accommodations to address what the evaluative information identified as J.R.'s "slow[] processing" issues. (*Id.* at 55-8.)

O'Sullivan further testified that at the CSE meeting, Plaintiffs expressed reservations about the recommended placement but did not expressly reject it. The WEDS members "fully agreed with the ... profile that had emerged during the IEP of [J.R.], had fully agreed with the-with the goals ..., the related services that we had recommended. They had reservations ... whether a program that size would be able to fully address his needs." (*Id.* at 58-61.) O'Sullivan explained: "[t]hey had concerns with the size of the group ... they had concerns with the class-with the main part of the program and the fact that there are 12 students. They had concerns with that. [T]hey felt he needed a high-high level of maximum amount of one to one support." (*Id.* at 81.) But no alternatives were offered at the CSE meeting by either S.F.R. or the WEDS members. (*Id.* at 61.) According to O'Sullivan, Fair, the WEDS teacher who participated in the CSE meeting and drafted the IEP, did not "urge" a more restrictive placement for J.R. (*Id.* at 96.)

18

Plaintiffs' attorney questioned O'Sullivan regarding the IEP's description of J.R.'s educational needs. Of note, the CSE did not recommend one-on-one sessions for "academic support[]" because the CSE did not feel that J.R. needed it: "[h]e is not presenting with interfering behaviors. He is not learning in an extremely atypical manner. He is a socially involved and we felt-would be able to-to make progress, in-in a group learning situation."[13] (Id. at 81-2.) The CSE also rejected a 12:1+1 placement in a specialized school as "overly restrictive." (Id. at 96-7.) O'Sullivan was questioned about a comment by S.F.R. that is noted in the Psychoeducational Evaluation report, that J.R. "became overwhelmed by sensory issues ...." (Tr. at 104; Psychoeduc. Eval. 2.) O'Sullivan testified that still he thought that the child should be in a 12:1+1 classroom in a "large school" and that S.F.R. "report[ed that] he presented with no behavior problems." (Id. at 104-06.)

O'Sullivan was also questioned about S.F.R.'s comment that J.R. "used to be enrolled in sports activities; however, the noise and competition overwhelmed and upset him" in recommending that the child not be placed in a "self-contained school ...." (Psychoeduc. Eval. 3; Tr. at 107.) O'Sullivan responded that during the CSE meeting, neither Plaintiffs nor the WEDS members wanted placement in a "self-contained school" and that "they were in agreement with the community school." (Tr. at 107-08.) Moreover, "[t]here is no indication that ... [J.R.] is currently getting overly stressed by sensory input. That-it's-that's one line taken out of his early developmental history, did not seem to be part of the present profile." (Id. at 127.) Plaintiffs' counsel countered that the evaluative information which indicated that J.R. did not

---

[13]   This testimony is puzzling because O'Sullivan also testified that individual and small group S/L therapy sessions were recommended to improve J.R.'s "receptive and expressive language" as well as his "reading" skills, all of which would necessarily improve his academics.

exhibit "behavioral difficulties" was when J.R. attended WEDS in a smaller classroom. (*Id.* at 127-30.)

b. Susan Feldman

Feldman, the Dean of the Winston School, is a certified special education teacher and has a master's degree in education. She has been teaching at the School for the past 28 years. (*Id.* at 145-46.) Feldman testified about the School's teaching philosophy, the credentials of their teachers, how students with similar learning difficulties are grouped in the same class, how J.R.'s educational needs were evaluated, the teaching methods and "interventions" used with J.R., and how J.R. progressed at the School. She also answered questions about the Winston School's progress reports on J.R.

The Winston School caters to students in the fourth through twelfth grades with learning disabilities, particularly those with language processing[14] issues. The School's philosophy is "independence" whereby they teach students to advocate for themselves and how to work through their own academic and social problems. There are approximately 180 students in the school, most of whom have IEPs. (Tr. at 147-48, 150-51, 191-92.)

During the 2013-14 school year, J.R. was in a 12:1 seventh grade classroom at the Winston School. He was with 11 other students for the core subjects, and fewer students for other subjects. His classmates were between 12 and 14 years of age. Each student attended his/her own Focus class at the same time. (*Id.* at 173, 181-85, 191.)

---

[14] Issues "relat[ing] … to the processing of language … can affect expressive language (what you say) and/or receptive language (how you understand what others say)." https://ldaamerica.org/types-of-learning-disabilities/language-processing-disorder/

The Winston School does not offer related services because it "offers an integrated service model" whereby a student receives the services that he or she needs throughout the day. Therefore, a student not need be pulled out from class for "language or receptive language or expression of language [sessions,] it's right there in every class." Testing accommodations are also individualized for each student. (*Id.* at 157, 185-86, 188-89, 196.)

Feldman works with the Focus teacher to review the IEPs and develop a student's annual learning goals. Feldman also plans the "social and emotional curriculum" for three classes, meets with teachers twice a month to discuss their classes, holds workshops for the teachers, and once a week, she holds group meetings with the teachers for each group of classes. (*Id.* at 91-2, 147-51, 191-92.)

When J.R. first arrived at the Winston School, he came with a "neuro psych evaluation[,]" reports from J.R.'s teachers at WEDS, and a letter from his parents. The Winston School conducted testing and obtained a writing sample from J.R. The School relied on all these materials, test results, as well as J.R.'s IEP to determine his strengths and weaknesses and develop his annual goals. (*Id.* at 178-79.) Feldman described him as someone who has difficulty with "expressive and receptive language," "comprehension," "written work and written expression[,]" and who "processes information very slowly." (*Id.* at 151.) J.R.'s Focus class concentrated on improving his expressive and receptive language skills. (*Id.* at 174.)

Feldman also testified that since she observes J.R. in class with his other teachers, her observations regarding J.R. are likely to be similar to the observations of his other teachers. All teachers at the Winston School use the same teaching techniques and methods. Feldman testified that J.R. became more comfortable by the end of the school year than when he began attending the school in September 2013. By the end of the school year, he had friends, asked questions

about science, and asked Feldman to borrow books from the School. He had also started studying with another student and would help when another student had difficulty. (*Id.* at 196-97, 200-01.)

      c.     Sharon Waldman

Waldman, J.R.'s Focus teacher, testified about her professional background and educational history, the Focus program, and J.R.'s progress in her Focus classes. (*Id.* at 207-58.)

      d.     S.F.R.

S.F.R. was the last witness to testify at the due process hearings. She was first asked about J.R.'s "special needs" during his last year at WEDS, the 2012-13 school year. She testified that he

> still demonstrated ... a significant amount of insecurity in school [and] lack of confidence, [and was] very agitated at times when he was not understood, like when we would go into conversations with his family members or anyone that would ask him certain questions that were—the answer would have, like, two parts or three parts to the answer, he would shut down. He would feel very anxious not being clear.
>
> I feel also he already understood that he did have a deficiency, and he could not really answer the question properly, so he would become very withdrawn.
>
> Oftentimes, he said he didn't want to go to school; he didn't feel comfortable with school. He felt it was very hard. But he is a dedicated student, so he tries his very, very best.

(*Id.* at 268.)

S.F.R. likes the Winston School because of the daily 45-minute Focus sessions. (*Id.* at 270, 276.) She also testified that since attending the Winston School, although J.R. "still struggles" with conversations, he is "more expressive" and "less anxious" in conversing with relatives. (*Id.* at 277-82.) J.R. received counseling and S/L therapy at the Winston School and that the S/L therapy was done in individual and small group session. (*Id.* at 310.) After a

domestic crisis in 2014, counseling at the Winston School and "conversations" in his Focus class helped J.R. to become less anxious and less "withdrawn[.]" (*Id.* at 311-12.)

Consistent with O'Sullivan's testimony, S.F.R. testified that during the CSE meeting, she and the WEDS members participated with the rest of the CSE in developing J.R.'s Annual Goals and agreed with them. (*Id.* at 291-93.) She also testified that the number of students in J.R.'s WEDS classroom ranged from three to nine students depending on the subject. (*Id.* at 294.)

When the local school recommended a 12:1+1 classroom during the June 3, 2013 CSE meeting, "[a]ll the [WEDS] teachers disagreed, and they had said they would strongly recommend a nonpublic school setting for [him]." The parent advocate also had the same reaction. The WEDS members and Plaintiffs told the CSE that they objected to the recommendation because J.R. "needs extensive, extensive, individualized attention – that's academically and also in the home—constant repetition, clarification. We felt that his needs-he really needed that 1:1 that crossed over to all the classes that he would have." S.F.R. did not clarify what she meant by "1:1 that crossed over to all the classes ...." Nor did she clarify why the recommended one-on-one instruction for J.R. twice a week for 45 minutes failed to provide enough individualized instruction for J.R. After hearing the CSE's recommended placement during the CSE meeting, S.F.R. told the rest of the CSE that she would continue to look for private schools with "appropriate programming" to be financed by Defendant. (*Id.* at 273-75.)

S.F.R.'s most clear testimony was that the IEP should have, but did not, recommend a private school placement. When asked what kind of program that she wanted from the local school, she responded "private school[,]" because no public school could offer "that individualized focus[,]" even if the CSE had recommended a 6:1+1 classroom. (*Id.* at 295-96.) After conceding to having no experience with public schools, she was asked again why public

school teachers could not provide J.R. with the attention that he needs, she responded that when the CSE walked her through the offered program and placement, she became uncomfortable and "that's when I had started I am going to do some further, you know, search" for him, it was "based on what, you know, what I felt at the time." (*Id.* at 296-97.) She also testified that

> It was the ratio, but more the type of individualized need for him and having a program that fit the need for him to have able to have concentrated-you know, like someone-constant repetition, the customized work for him. So it was not solely only about the ratio of the classroom, but about the specific need of him needing this one on-you know, like a one on one or, you know, constant work with him individually."

(*Id.* at 294.) S.F.R. was also uncomfortable with the fact that the paraprofessional assisting in the class was not a certified teacher. (*Id.* at 296-97.)

She agrees with the IEP's description of "his present level of performance." (*Id.* at 297.) She also conceded that at the time of the CSE meeting, she agreed with the recommended related services. (*Id.*) She tried visiting the recommended community school but they were closed at the time for the summer break. (*Id.* at 304.) Her rejection of the recommended program is based on the CSE meeting, not the community school itself. (*Id.* at 304-05.) She does not want J.R. to attend the community school because it is a large setting and J.R. gets anxious when they go out to see a Broadway show and there are a lot of people round: "he shuts down; he becomes very moody." (*Id.* at 316-17.)

After receiving their notice of recommended placement and program, S.F.R. faxed a letter to the local school stating that she was rejecting the recommendation, but she has since lost her copy of the faxed letter. (*Id.* at 301-06, 313.) S.F.R. testified that during the CSE meeting, the only objection by any participant was to the recommended "12:1:1 in the community school" placement. (*Id.* at 306-07.)

**E.** **The IHO Decision**

On August 15, 2014, IHO Judith Schneider issued a decision. (IHO Findings of Fact and Decision.) She determined that the IEP developed for J.R. for the 2013-14 school year was not reasonably calculated to enable J.R. to receive educational benefits, that the Winston School is an appropriate placement for him, the equities favor Plaintiffs, and therefore, Defendant should pay the tuition for J.R.'s attendance at the Winston School for the 2013-14 school year. (*Id.*)

The IHO noted that the only issue before her was "whether the DOE has established that it provided a FAPE [*sic*] is the parents' claim that the 12:1:1 community school program with various related services recommended by the DOE was not reasonably calculated to enable this student to make meaningful educational gains."[15] (*Id.* at 6.) In discussing "[t]he evidence in this matter," the IHO reviewed the findings in the evaluative information. (*Id.* at 6-8.) The IHO then noted that "[t]hese documents were considered by the CSE which then recommended a 12:1+1 program with a total of 7 pull out sessions of speech language therapy and counseling." (*Id.* at 8.)

The IHO also summarized O'Sullivan's testimony "in support of the program[.]" The IHO noted that O'Sullivan testified that:

> the student had no significant interfering behaviors and that he needed a class in which he could work on his language and social skills to improve self-esteem and self-advocacy with his peers. (T. 51) A class of 12 would provide the opportunity to learn appropriate behavior from peers, to experiment socially and interpersonally and practice language skills but would be sufficiently structured, with the staffing ration provided. (T. 53-53) [*sic*]
>
> With regard to academic instruction, NOS testified that the recommended program was consistent with the recommendations in the Mt. Sinai evaluation and by West End staff in that it would provide individualized instruction and individualized support. (T. 50-51) The paraprofessional in the classroom could

---

[15] The IHO did not note nor did she adjudicate Plaintiffs' arguments in their due process complaint that the IEP was procedurally defective. (Due Process Compl. ¶ 25.)

provide necessary prompting and focusing. (T. 51) Further SL and counseling sessions provided an opportunity for 1:1 support.

(*Id.* at 8.) But the IHO took issue with the recommended class size: "in view of [J.R.]'s academic and language difficulties in the much more intense staffing ratio of West End, I find no support for the CSE's conclusion that in the larger class he could make appropriate gains." (*Id.*) The IHO did not mention that a smaller public school classroom was not satisfactory to S.F.R. because S.F.R. sought only a private school placement. (Tr. at 295-96.) Instead, the IHO credited testimony from S.F.R. that she and the WEDS members had "disagreed" with the IEP's recommendations during the CSE meeting. (IHO Findings of Fact and Decision 8.)

The IHO also focused on J.R.'s social difficulties:

[h]e had social and emotional difficulties even in the small classes that West End provided. The program the CSE provided would require repeated pullouts, sometimes twice a day, and, I conclude, would likely exacerbate his embarrassment and result in increased withdrawal. The evidence shows that this student's social difficulties are a result of his limitation academically and in speech. I conclude that unless those deficits are addressed in an appropriate program, the student's social and emotional difficulties and withdrawal would increase regardless of the size of the peer group."

(*Id.* at 9.) Thus, the IHO concluded, irrespective of class size, J.R. would continue to feel withdrawn if the CSE failed to recommend "an appropriate program ...." (*Id.*) But like Plaintiffs, the IHO did not mention how the evidence showed that the recommended program was inappropriate, or how, putting aside class size, the CSE could have recommended a more "appropriate program."

The IHO also rejected Defendant's argument that the IEP was appropriate for J.R. given that the Winston School had him in the same class size but without an additional adult. (*Id.*) The IHO concluded that "that the Winston School program is distinctive and in no way comparable to a public school program and the student's progress in that program does not

support a conclusion that he would progress in the very different program proposed by the CSE

...." (*Id.*) The IHO based this conclusion on her findings that: (1) the Winston School has an

"integrated program with the same instruction carried over into different classes to provide

ongoing reinforcement and repetition[;]" (2) its organization of students into groups "at the same

functioning levels[;]" and (3) its use of "a dedicated teacher" to work with J.R. individually

everyday "to reinforce what is happening in the class and to develop his communication skills."

(*Id.*)

The IHO also concluded that Plaintiffs met their burden in showing that the Winston

School was an appropriate placement for J.R., and that the equities favored Plaintiffs because

they cooperated with the CSE. Thus, the IHO directed Defendant to reimburse Plaintiffs for any

tuition that they paid to the Winston School for the 2013-14 school year and to directly pay the

Winston School any balance due. (*Id.* at 10-14.)

**F.    The SRO Decision**

Defendant appealed the IHO's decision on the grounds that the IEP for J.R. for the 2013-

14 school year was substantively adequate. (Admin. Rec. SRO Decision 5.) On October 23,

2014, SRO Carol Hauge reversed the IHO's decision concerning the IEP's substantive adequacy

and denied Plaintiffs' claim for tuition reimbursement from Defendant. The SRO also noted that

since Defendant did not appeal the portion of the IHO's decision that the Winston School is an

appropriate placement for J.R. "or that equitable considerations weighed in favor of the parents'

requested relief[,]" those portions of the IHO's decision "are final and binding on both parties

and will not be addressed in this decision." (*Id.* at 1-4, 5 n.3.)

In finding that the IEP was reasonably calculated to enable J.R. to receive educational

benefits, the SRO concluded that the CSE considered the evaluative information in the

Psychoeducational Evaluation report, the WEDS reports, and input from the WEDS members in recommending "a 12:1+1 special class placement with related services at a community school for the 2013-14 school year ...." (*Id.* at 8.) The SRO began her analysis by noting that "although the student's present levels of performance and individual needs are not directly in dispute, a discussion thereof provides context for the discussion of the ultimate issue to be resolved-namely, whether the 12:1+1 special class placement with related services at a community school was appropriate." (*Id.* at 5-7.) The SRO then reviewed the IEP's description of J.R.'s educational needs, Annual Goals, and Management Needs. She also noted when the IEP's findings and recommendations were consistent with the Psychoeducational Evaluation and/or the WEDS reports. (*Id.* at 7-8.) The SRO further noted that the CSE rejected other classroom and school placements as either overly restrictive or not restrictive enough environments for J.R. (*Id.*)

The SRO deferred to O'Sullivan's testimony about how the recommended 12:1+1 special class placement and the related services would help meet J.R.'s educational needs in the least restrictive environment. (*Id.* at 9.) The SRO also determined that the IHO ruled *sua sponte* that the IEP's recommended "repeated pullouts from school" would exacerbate J.R.'s emotional issues because Plaintiffs did not raise this issue in their due process complaint. Moreover, the SRO determined, the ruling was not supported by evidence. (*Id.* at 9 n.4.) The SRO also deferred to O'Sullivan's testimony that the WEDS members who attended the CSE meeting agreed with all of the recommended related services. (*Id.* at 9.)

The SRO concluded that Defendant had met its burden to prove that the IEP's recommendations for the 2013-14 school year provided J.R. with a FAPE. (*Id.* at 9-10.)

# PROCEDURAL HISTORY

On January 22, 2015, Plaintiffs filed the instant lawsuit. (ECF No. 1.) On August 31,

2015, Plaintiffs moved for summary judgment under Federal Rule of Civil Procedure 56. (ECF

No. 19.) Plaintiffs argued that the Court should reject the SRO's decision and instead, uphold

the IHO's decision that, for the 2013-14 school year, Defendant's "public school program and

placement recommendation was not reasonably calculated to confer educational benefit to J.R."

and that Plaintiffs' "placement of J.R. at the Winston School was appropriate and must be funded

by the defendant." (Pls. Memo. of Law in Support of Their Mot. for Summ. J. 1, ECF No. 21.)

The crux of Plaintiffs' argument is that the IEP for the 2013-14 school year was not reasonably

calculated to confer educational benefits on J.R. because the IEP failed to recommend placement

in the Winston School or another private school. (*Id.* at 15-23.) Therefore, Plaintiffs argue, and

also because of favorable "equitable considerations[,]" the Court should award Plaintiffs "full

tuition reimbursement and retrospective funding by the defendant for J.R.'s enrollment at

Winston School for the 2013-14 school year...." (*Id.* at 28-9.) Plaintiffs also argue that

O'Sullivan lacked credibility as a testifying witness because the IEP did not reflect all of the

concerns expressed by WEDS members and S.F.R during the June 3, 2013, CSE meeting.[16] (*Id.*

at 23-4.)

---

[16] Defendant correctly argues that Plaintiffs' attack on O'Sullivan's credibility does not bear on O'Sullivan's testimony about the CSE's deliberations. (Def. Memo. of Law in Opp. to Pls. Cross-Mot. for Summ. J. 13-4.) Plaintiffs do not dispute O'Sullivan's testimony about how and why the CSE formulated the IEP for J.R.'s 2013-14 school year, except to argue that O'Sullivan allegedly failed to record all the concerns that Plaintiffs raised during the CSE meeting to the recommended program and placement. (Pls. Memo. of Law in Support of Their Mot. for Summ. J. 23-4.) But even if Plaintiffs are correct, since the CSE meeting, Plaintiffs have had the chance to argue their case in both the due process proceedings and in this litigation. Plaintiffs also argue that O'Sullivan "falsely" testified that they did not ask for a private school or referral to the Central Based Support Team, and that Plaintiffs did not want a self-contained school. (*Id.* at 25.) Defendant correctly explains why this argument is meritless. (Def. Memo. of Law in Opp. to Pls. Cross-Mot. for Summ. J. 14.)

Defendant has cross-moved for summary judgment. (ECF No. 23.) Defendant argues that: (1) the Court should defer to the SRO's decision denying Plaintiffs' request that Defendant reimburse them for enrolling J.R. in a private school; (2) nonetheless, a *de novo* review of the record supports the SRO's decision that Defendant's public school program and placement recommendation offered J.R. a FAPE; and (3) the Court should reject Plaintiffs' claim seeking tuition reimbursement under the IDEA's pendency placement provision because the record contains insufficient evidence to make this determination. (Def. Memo. of Law in Support of its Cross-Mot. for Summ. J., ECF No. 23-1.) But since Plaintiffs do not seek tuition reimbursement pursuant to the IDEA's so-called pendency provision under 20 U.S.C. § 1415(j), the Court need not rule on Defendant's argument concerning this issue.[17]

## DISCUSSION

Although parties usually seek adjudication of IDEA cases by moving for summary judgment under Federal Rule of Civil Procedure 56, an IDEA "case is essentially an appeal from a hearing officer's decision ...." *Brennan v. Regional Sch. Dist. No. 1 Bd. of Educ.*, 531 F. Supp. 2d 245, 262 (D. Conn. 2007). "Summary judgment in this context involves more than looking into disputed issues of fact; rather, it is a pragmatic procedural mechanism for reviewing administrative decisions." *M.O. v. N.Y.C. Dep't of Educ.*, 793 F.3d 236, 243 (2d Cir. 2015) (internal quotation marks omitted) (citing *A.C. ex rel. M.C. v. Bd. of Educ.*, 553 F.3d 165, 171 (2d Cir. 2009)). In making this determination, "the court (i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii)

---

[17] In letters addressed to the Court after summary judgment briefing was complete, Plaintiffs continued to argue that they could not afford J.R.'s tuition at the Winston School. They also noted that Defendant funded J.R.'s tuition at the Winston School for the 2014-15 and 2016-17 school years. In response, Defendant argued, *inter alia*, that the Court's ruling in this case would have no impact on Defendant's assessment of J.R.'s educational needs after the 2013-14 school year. (ECF Nos. 31-6.)

basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C). In other words, in reviewing a state administrative decision under the IDEA, the Court should "engage in an independent review of the administrative record and make a determination based on a 'preponderance of the evidence' ...." *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 112 (2d Cir. 2007) (quoting *Mrs. B. v. Milford Bd. of Educ.*, 103 F.3d 1114, 1120 (2d Cir. 1997)); *see also Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 192 (2d Cir. 2005).

Such a review, however, is "circumscribed." *W.M.*, 783 F. Supp. 2d at 504. "[T]he Supreme Court has cautioned that such review 'is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review.'" *Cerra*, 427 F.3d at 192 (quoting *Rowley*, 458 U.S. at 206). The Court must "give due weight" to the state administrative proceedings under review, "mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." *Id.* (quoting *Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 129 (2d Cir. 1998)). The Second Circuit has ruled on the types of determinations by state administrative officers that should be accorded greater deference by the courts:

> Determinations regarding the substantive adequacy of an IEP should be afforded more weight than determinations concerning whether the IEP was developed according to the proper procedures. Decisions involving a dispute over an appropriate educational methodology should be afforded more deference than determinations concerning whether there have been objective indications of progress.

*R.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167, 189 (2d Cir. 2012) (internal quotation marks omitted) (quoting *M.H.*, 685 F.3d at 244), *cert denied*, 2013 U.S. Dist. LEXIS 4528 (June 10, 2013). The Second Court has "not hesitated to vacate district court opinions where the district

court 'erred in substituting its judgment for that of the agency experts and the hearing officer.'"

*Cerra*, 427 F.3d at 195 (quoting *Briggs v. Bd. of Educ.*, 882 F.2d 688, 693 (2d Cir. 1989)).

Moreover, in cases where the IHO and the SRO disagree, "[i]t is not for the federal court to choose between the views of conflicting experts on such questions." *R.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167, 189 (2d Cir. 2012) (internal quotation marks and citation omitted), *cert denied*, 2013 U.S. Dist. LEXIS 4528 (June 10, 2013). "When an IHO and SRO reach conflicting conclusions, we defer to the final decision of the state authorities, that is, the SRO's decision." *Id.* (internal quotation marks and citation omitted).

But "the deference owed to an SRO's decision depends on the quality of that opinion." *Id.* (citing *M.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217 (2d Cir. 2012)). "Reviewing courts must look to the factors that normally determine whether any particular judgment is persuasive, for example, whether the decision being reviewed is well-reasoned, and whether it was based on substantially greater familiarity with the evidence and the witnesses than the reviewing court." *Id.* (citing *M.H.*, 685 F.3d at 244). Furthermore, "the district court should afford more deference when its review is based entirely on the same evidence as that before the SRO than when the district court has before it additional evidence that was not considered by the state agency." *Id.* (internal quotation marks omitted) (quoting *M.H.*, 685 F.3d at 244). "[W]here the SRO rejects a more thorough and carefully considered decision of an IHO, it is entirely appropriate for the court, having in its turn found the SRO's conclusions unpersuasive even after appropriate deference is paid, to consider the IHO's analysis, which is also by greater educational expertise than that of judges, rather than to rely exclusively on its own less informed educational judgment." *Id.* (internal quotation marks omitted) (citing *M.H.*, 685 F.3d at 244).

"If an IEP does not provide a FAPE, and the parents wish to remedy this by sending their child to private school at public expense, IDEA provides the parents with two remedial mechanisms." *Brennan*, 531 F. Supp. 2d at 264. "The first of these is reimbursement, which is set in motion when the parent unilaterally enrolls the student in private school. The parents then sue, and they are reimbursed for their expenses in a given year if the court agrees that the IEP for that year denied a FAPE, and that the private school placement was appropriate." *Id.* (citing *Burlington*, 471 U.S. at 369-70; *Gagliardo*, 489 F.3d at 111-12). Reimbursement, therefore, is not permissible if the IEP for that school year provides the child with a FAPE. "Parents who unilaterally place their child in a private school do so at their own financial risk." *M.O.*, 793 F.3d at 243 (internal quotation marks and citation omitted).

Under what is called the Burlington-Carter test for the Supreme Court holdings in *Florence County School District Four v. Carter* and *School Committee of Town of Burlington v. Department of Education,* determining whether parents are entitled to reimbursement for the unilateral placement in a private school entails a two-prong inquiry. *R.E.*, 694 F.3d at 185 (citing *Carter,* 510 U.S. 7 (1993); *Burlington*, 471 U.S. 359 (1985)). Under Prong I, "the local school board bears the initial burden of establishing the validity of its plan at a due process hearing. [Under Prong II, i]f the board fails to carry this burden, the parents bear the burden of establishing the appropriateness of their private placement and that the equities favor them." *R.E.*, 694 F.3d at 184-85 (citing N.Y. Educ. Law § 4404(1)(c); *Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 192 (2d Cir. 2005)); *see also Gagliardo*, 489 F.3d at 111-12.

Under Prong I, a local school board has met its burden when it shows that the IEP meets both the IDEA's procedural and substantive adequacy requirements. *Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 206 (1982). The school must show

that in developing that IEP, it complied with the IDEA's procedural requirements. *Id.*; *Cerra*, 427 F.3d at 192. As to substantive adequacy, the school must show that the IEP is "reasonably calculated to enable the child to receive educational benefits[.]" *Rowley*, 458 U.S. at 206-07. In 2017, the Supreme Court clarified this standard: "[t]o meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F. v. Douglas County School District*, 197 L. Ed. 2d 335, 349 (2017). "[W]ith respect to a child who is not fully integrated in the regular classroom[,] .... [a] child's educational program must be appropriately ambitious in light of his circumstances.... This standard is more demanding than ... *de minimis* progress ...." *Id.* at 342.

In making a determination about the substantive adequacy of the IEP, the Court must examine the IEP itself. *M.O.*, 793 F.3d at 245. "[A] school district fulfills its substantive obligations under the IDEA if it provides an IEP that is likely to produce progress, not regression, and if the IEP affords the student with an opportunity greater than mere trivial advancement." *Cerra*, 427 F.3d at 195 (internal quotation marks and citation omitted). The substantive adequacy "inquiry requires courts to determine whether the content, *methodology*, or *delivery* of instruction have been narrowly tailored to address the unique needs of the child that result from the child's disability." *A.M. v. N.Y.C. Dep't of Educ.*, 2017 U.S. App. LEXIS 399 at *40 (2d Cir. Jan. 10, 2017) (internal quotation marks omitted) (citing 34 C.F.R. § 300.39(b)(3)(i)).

## A.     Issue for Judicial Review

Here, the IHO and SRO disagree. The Court will now determine whether the SRO's findings and conclusions are supported by a preponderance of the evidence in the record. If so,

the Court will defer to the SRO's decision. *See W.M.,* 783 F. Supp. 2d at 504 (the Court should "conduct[] an independent review of the administrative record and then make a determination based on a preponderance of the evidence") (quoting *Gagliardo,* 489 F.3d at 112); *Cerra,* 427 F.3d at 192 (2d Cir. 2005); *R.E.,* 694 F.3d at 189 ("When an IHO and SRO reach conflicting conclusions, we defer to the final decision of the state authorities, that is, the SRO's decision") (internal quotation marks and citation omitted).

In the due process proceedings, Defendant only appealed the IHO's Prong I determination that the IEP for J.R. for the 2013-14 school year was not substantively adequate. (SRO Decision 4-5.) Thus, the IHO's decision under Prong II, that the Winston School was an appropriate placement for J.R. for the 2013-14 school year and that the equities favored Plaintiffs such that Defendant should pay for J.R.'s tuition was not challenged and not addressed by the SRO. Nor was it challenged in this litigation. Consequently, that portion of the IHO's decision still stands. *See* 34 CFR § 300.514(a) ("A decision made in a hearing conducted pursuant to §§ 300.507 through 300.513 [concerning the administrative process to complain about, *inter alia,* the placement of a disabled child] or §§ 300.530 through 300.534 is final, except that any party involved in the hearing may appeal the decision under the provisions of paragraph (b) of this section and § 300.516".)

**B.    The Court Defers to the SRO's Decision Concerning Educational Policy Issues Because the Decision is Supported by a Preponderance of the Evidence**

Although the SRO's decision could have been better-reasoned, her decision that the IEP was reasonably calculated to enable J.R. to receive educational benefits in the least restrictive environment for the 2013-14 school year was supported by a preponderance of the evidence. Moreover, since the SRO's decision concerned educational policy issues, namely the substantive adequacy of the IEP, deference is particularly appropriate because "the judiciary generally lacks

35

the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." *Cerra*, 427 F.3d at 192 (internal quotation marks omitted) (quoting *Rowley*, 458 U.S. at 208).

The SRO concluded that "the evidence in the hearing record reflects that the June 2013 CSE considered a March 2013 psychoeducational evaluation, a May 2013 social history, March/May 2013 progress reports, and input from both the parents and nonpublic school staff in attendance ...." (SRO Decision 7.) She further concluded that "[b]ased upon the review and consideration of the evaluative information, ... [the CSE] recommended a 12:1+1 special class placement with related services at a community school for the 2013-14 school year." (*Id.* at 8.)

The SRO's analysis began by noting that although J.R.'s academic performance and educational needs were not disputed, a discussion regarding the IEP's assessment of those issues was necessary for context. (*Id.* at 7.) She found that the IEP's description of J.R.'s "overall intellectual functioning is ... consistent with the March 2013 psychoeducational evaluation report[.]" (*Id.*) In fact, the IEP cited to the Psychoeducational Evaluation report and used the test results discussed therein to describe J.R.'s academic strengths and weaknesses. (IEP 1.) The SRO also noted that the IEP described J.R. as needing "clarification of directions, and assistance with identifying the main idea of paragraphs, organizing his thoughts on paper, and applying grammar rules ...." (*Id.* at 8.) The IEP's description is consistent with the WEDS progress reports. (*See e.g.*, WEDS progress report at "Written Communication" stating that "[w]riting is a very slow and laborious process for [J.R.] He struggles greatly to recall and apply grammar and spelling rules".) The SRO did specifically find that "[c]onsistent with the March 2013 psychoeducational evaluation report and the March/May2013 progress reports, the June 2013 IEP described the student as cooperative, respectful, and responsive to support from peers and

adults, and further noted the parents' concerns regarding the student's language difficulties ...."
(*Id.*)

The SRO also reviewed J.R.'s recommended Management Needs listing how material should be presented to him in small digestible chunks - "visual prompts and schedules, structured presentation of tasks, instruction presented in 'segmented chunks,' concise directions with accompanying visual supports, and 'skeleton notes' to address the student's slower processing speed...." (SRO Decision 8) (quoting the IEP at 2.) The SRO should have noted that the Management Needs mirror the "accommodations" that Mt. Sinai recommended to improve J.R.'s "verbal comprehension skills[:]" which include "visual cues to reiterate instructions and routines ...[,] provid[ing] structure for all academic activities including specific visual directions and a formal routine for tasks ...[,] presenting [material] in small segments with breaks interspersed ...[, and] skeleton notes for lecture-based classes where he can fill in the details ...." (Psychoeduc. Eval. 9.) The Management Needs that the CSE recommended for J.R. are also consistent with WEDS' observation that he "requires repetition of directives [*sic*][,]" and "benefits from check-ins." (WEDS Speech and Language: Goals and Objectives report.)

The SRO also noted that "[t]he June 2013 CSE also created approximately 13 annual goals to address the student's needs in reading, writing, mathematics, expressive and receptive language, organization, and counseling (id. at pp. 3-8.)" (SRO Decision 8.) According to O'Sullivan's undisputed testimony, the CSE "developed [these goals] from the information that came from the psychological [*sic*] evaluation, from the [WEDS] progress reports, and confirmed with the verbal accounts by the [WEDS] teachers." (Tr. at 42.) Everyone participated in developing the annual goals, "the Parents, the advocate, the teachers, the service providers .... [E]ach goal addressed were [*sic*] collaboratively identified and addressed." (*Id.* at 43, 44.)

Regarding the recommended 12:1+1 special class placement, the SRO noted that under New York State law, such a placement "is designed to address students whose management needs interfere with the instructional process, to the extent that an additional adult is needed within the classroom to assist in the instruction of such students (8 NYCRR 200.6[h][4][i])." (SRO Decision 8.) (internal quotation marks omitted). This is consistent with O'Sullivan's testimony that an additional adult, a paraprofessional, was recommended to "assist with making the - the lesson more accessible for [J.R.]" by using the recommended instructional methods listed as J.R.'s Management Needs. (Tr. at 51.)

The SRO then pointed out that the CSE rejected placement in a "general education setting[,]" an "integrated co-teaching[,]" model, and a 12:1:1 special class in a specialized school because those placements were either too restrictive an educational environment for J.R. or not restrictive enough, and that neither Plaintiffs nor the WEDS members wanted J.R. in a specialized school. (SRO Decision 8.) (citing Tr. at 58-60, 96-7, 107-09). Presumably, the SRO noted this to show that the CSE deliberated on the least restrictive educational environment for J.R., a requirement under the IDEA. *See* 20 U.S.C. § 1412(a)(5)(A).

The SRO deferred to O'Sullivan's testimony regarding how the 12:1+1 special classroom would meet J.R.'s educational needs:

- "given the student's challenges in a variety of academic areas-the CSE wanted to provide enough special education support, and enough adult attention throughout the day, and therefore, recommended a full time, small, special class for that purpose (Tr. pp. 50-51)[;]"

- "the student's annual goals could be properly addressed in such a setting[;]"

- the CSE "wanted a paraprofessional in the class to assist the student in accessing the lesson being taught, and the activities in the classroom. In addition, ...a paraprofessional could provide the student with some of the strategies listed within the student's management needs[;]"

- the CSE "did not want the student placed with too few children because the

38

student did not present with significant interfering behaviors[;]" and

- "the June 2013 CSE wanted to offer the student a balanced program that would provide both structure and opportunities for group academics and also group socializing (Tr. pp. 52-54)[.]"

(*Id.* at 9) (internal quotation marks omitted).

The SRO again deferred to O'Sullivan's testimony as to the adequacy of the recommended related services of individual S/L therapy twice a week and S/L therapy in a group of three students twice a week, individual counseling once a week and group counseling with two other students twice a week:

- the individual counseling sessions were recommended to address J.R.'s "sadness, and lowered self-esteem[;]"

- the group counseling sessions were recommended to give J.R. a chance to build his "interpersonal skills" in a "structured" and "monitored" environment;

- the individual S/L therapy was recommended to provide J.R. with "intensive instruction to address his specific delays in receptive and expressive language and reading" and

- "with the further support of the recommended pull out related services, the June 2013 IEP provided the student with sufficient support and fortified the recommended 12:1+1 special class placement (Tr. p. 54)."

(SRO Decision 9, n.4) (internal quotation marks omitted). J.R. also received S/L therapy and counseling services at WEDS (WEDS Speech and Language: Goals and Objectives report), all services that S.F.R. wanted J.R. to have when he left WEDS (Social History Update). The recommended counseling was also consistent with Mt. Sinai's recommendation that J.R. receive "weekly counseling sessions at school in order to help him learn to utilize coping skills when" he gets nervous, especially for "test and performance related anxiety." (Psychoeduc. Eval. 11.)

Consequently, Plaintiffs are wrong to argue that "[t]he SRO simply ignores all objective testimony and the documentary record." (Pls. Memo. of Law in Opp. to Def. Cross-Mot. and in Further Supp. of Pls. Mot. for Summ. J. 5.) The SRO's decision that the 2013-14 IEP was

substantively adequate is supported by a preponderance of the evidence. Deference is particularly appropriate here because the SRO made findings on educational policy issues, which are issues that SROs have "greater institutional competence" about than courts. *R.E.*, 694 F.3d at 189 (internal quotation marks omitted) (quoting *M.H.*, 685 F.3d at 244). Deference is also appropriate here because the SRO reviewed the same evidence that is in front of the Court. *R.E.*, 694 F.3d at 189 (citing *M.H.*, 685 F.3d at 244).

In *Cerra*, the Second Circuit reversed a grant of the parents' summary judgment motion on their IDEA claims. *Cerra*, 427 F.3d at 188. The Court held that there was no "objective evidence" to support the district court's ruling overturning the SRO's decision. *Id.*; *see also J.S. v. Scarsdale Union Free Sch. Dist.*, 826 F. Supp. 2d 635, 670 (S.D.N.Y. 2011) (upholding "administrative officers' findings" because they were supported by "substantial evidence.") The *Cerra* Court explained that "the district court's determination that ... [the student] was unlikely to make progress under the proposed IEP is precisely the kind of educational policy decision a district court may not make absent objective evidence in the record suggesting that the SRO has reached an erroneous conclusion." *Id.* Similarly here, there is no "objective evidence" to support overturning the SRO's determination on the "educational policy decision" that the 2013-14 IEP for J.R. was substantively adequate.

In this litigation, Plaintiffs have not made any specific argument regarding the recommended related services or 12:1+1 classroom placement. Rather, in attacking the IEP, Plaintiffs make vague arguments that make clear that the only recommendation satisfactory to Plaintiffs is placement in the Winston School. Plaintiffs argue that "[t]he defendant's program was only calculated to leave J.R. adrift in the classroom and subject to resulting meltdowns and shutdowns academically, socially and emotionally[.]" (Pls. Memo. of Law in Supp. of Their

Mot. for Summ. J. 20.) But this argument is conclusory; Plaintiffs offer no support for it. Plaintiffs also argue that the IEP lacked "one to one time with teacher [which] was considered crucial for J.R. to participate in academic groups and in writing and reading[,]" and that "[w]ithout 1:1 support in a language based program, J.R.'s program recommendation in his IEP was not reasonably calculated for J.R. to receive the benefits of instruction." (Pls. Memo. of Law in Support of their Mot. for Summ. J. 14.) But Plaintiffs do not seek additional hours of one-on-one sessions for J.R. or a 1:1 classroom. Nor do Plaintiffs explain what they mean by a "language based program[,]" likely a reference to the Winston School which is a school for children with learning disabilities, especially language processing issues. (Tr. at 147-48.)

Plaintiffs' arguments are not supported by the record. Neither party disputes the recommendations in the Psychoeducational Evaluation report, drafted by a Ph.D. at Mt. Sinai, and the WEDS reports, which contain feedback from educators who interacted with J.R., that J.R. needs a small educational environment with consistent individual support:

- J.R. "need[s] a small learning environment supported by individual attention that can address his academic and emotional needs" (WEDS Progress Report);

- J.R. "requires consistent individualized attention in order to address his many academic needs. One-on-one time with the teacher is <u>crucial</u> to his ability to participate fully in his academic groups, as he struggles to process new information, skills, and abstract concepts." (WEDS report dated March 28, 2013); and

- J.R. "learns best when provided with intensive, individualized support as found in small, special education programs." (Psychoeduc. Eval. 9-10.)

As to a small educational environment, although the WEDS members and Plaintiffs raised concerns during the CSE meeting about the recommended class size (Tr. at 81), Plaintiffs no longer raise that concern. Nor could Plaintiffs raise such a concern because there is no evidence specifying a particular class size for J.R., just that he be schooled in a "small" learning environment. *See e.g., J.L. v. City Sch. Dist.*, No. 12Civ.1516, 2013 U.S. Dist. 25666, at *19

(S.D.N.Y. Feb. 20, 2013) (referring to a 12:1+1 placement as a "small classroom"). Moreover, neither the dean nor the teachers from the Winston School raised any concerns during the due process hearings about the J.R.'s IEP for the 2013-14 school year.[18] In fact, at WEDS, J.R. was in a 7:1+2 classroom for his core subjects and in smaller classrooms for Reading and Math. (Admin. Rec. Def. Ex. 3.) Moreover, Plaintiffs also do not dispute that J.R. "tends to be very hesitant to participate in social and academic discussions." (Admin. Rec. Def. Ex. 4 at report dated March 28, 2013.) O'Sullivan testified that, as a result, "we didn't want too few children in the - in the classroom, as [J.R.] was not presenting with significant interfering behaviors and did need a certain social forum both to enhance his language, but also to enhance his - his self-esteem and his self-advocacy or self-assertion with his - with his community, which are other - which really is other kids his age." (Tr. at 50-2.) Plaintiffs have not disputed this testimony. Plaintiffs also do not dispute O'Sullivan's testimony that during the CSE meeting, neither Plaintiffs nor the WEDS members offered any alternative program or placement (*Id.* at 61), and rejected alternative schools and classroom settings for J.R. (Tr. at 96-97, 107-08.)

The crux of Plaintiffs' argument is simply that the IEP is substantively inadequate because it did not recommend placement in the Winston School or another private school. This is why Plaintiffs have not made specific arguments about the IEP's inadequacy. When S.F.R. was questioned during the due process hearings to specify what kind of program she wanted from the local school, S.F.R. responded a "private school[,]" because no public school could offer "that individualized focus[,]" even in a 6:1+1 classroom. (Tr. at 295-96.) But this argument fails to recognize what a handicapped child is owed under the IDEA.

---

[18]  The Court notes but does not rely on the fact that J.R. was placed in a 12:1 classroom at the Winston School. (Tr. at 182.)

Under the IDEA, "[a] school district is not ... required to furnish every special service necessary to maximize each handicapped child's potential." *Cerra*, 427 F.3d at 195. "The Supreme Court has made clear that an IEP need not be perfect, nor do school districts need to maximize the potential of the disabled student." *C.L.* at *14 (citing *Rowley*, 458 U.S. at 184-85), *aff'd*, 552 Fed. Appx. 81 (2d Cir. Jan. 27, 2014). "To meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F.*, 197 L. Ed. 2d at 349. "[W]ith respect to a child who is not fully integrated in the regular classroom[,] .... [a] child's educational program must be appropriately ambitious in light of his circumstances.... This standard is more demanding than ... *de minimis* progress ...." *Id.* at 342. Thus, under the IDEA, Defendant does not have to provide J.R. with precisely the services that the Winston School offers. Defendant's obligation under the IDEA is to develop a program that is reasonably calculated to enable J.R. to make progress that is "appropriately ambitious in light of ... [J.R.'s] circumstances." *Id.*

Plaintiffs' arguments regarding why the Court should not defer to the SRO's decision also stem from their claim that the IEP violated the IDEA by not recommending placement in the Winston School. Plaintiffs argue that "[t]he SRO ignored [J.R.'s] need for greater language based supports throughout the day and FOCUS class with a 1:1 teacher which together provided the base for stability and progress for [J.R.] in 2013-14. This could not be provided in a 12:1:1 program in a community school with a paraprofessional." (Pls. Memo. of Law in Supp. of Their Mot. for Summ. J. 22.) The reference to the "Focus class" is obviously to the Winston School program. To put it clearly, Plaintiffs argue that the Court should not defer to the SRO's decision because she did not consider the Winston School's teaching methodology and J.R.'s progress

there after the IEP was developed. But in conducting her analysis under Prong I of the Burlington/Carter test, the SRO need not have considered either.

Where the Second Circuit has not ruled on this precise issue, district courts in this jurisdiction have relied on other circuit court rulings to find that the substantive adequacy "determination is necessarily prospective in nature; we therefore must not engage in Monday-morning quarterbacking guided by our knowledge of ... [the child]'s subsequent progress at ... [a private school], but rather consider the propriety of the IEP with respect to the likelihood that it would benefit ...[the child] at the time it was devised." *J.R. v. Bd. of Educ.*, 345 F.Supp.2d 386, 395-96 (S.D.N.Y. 2004) (citing *Antonaccio v. Bd. of Educ.*, 281 F.Supp.2d 710, 724 (S.D.N.Y. 2003) (citing *Carlisle Area Sch. v. Scott P. By and Through Bess P.*, 62 F.3d 520, 530 (3d Cir. 1995); *Roland M. v. Concord Sch. Committee*, 910 F.2d 983, 992 (1st Cir. 1990), *cert. denied*, 499 U.S. 912 (1991); *Bd. of Educ. of the County of Kanawha v. Michael M.*, 95 F. Supp. 2d 600, 609 (S.D.W. Va. 2000))). Thus, "[t]hat ...[the child] benefited from ...[the private school] does not mean that she would not have benefited from the District's proposed ... IEP, and the *ex post* information about her subsequent progress in private school is therefore irrelevant to the inquiry about whether the District's IEP was reasonably calculated to enable ...[the child] to receive educational benefits in the ... [that] academic year." *J.R.*, 345 F.Supp.2d at 396 n.13 (granting the defendant's summary judgment motion dismissing the parents' complaint under the IDEA and denying the parents' summary judgment as moot). Similarly in *Antonaccio v. Board of Education of Arlington Central School District*, the Court found that the IHO and SRO improperly considered testimony regarding how the child progressed when the IEP at issue was implemented "because it does not relate to whether the IEP was reasonably calculated to benefit [the child] at the time the CSE devised the IEP." 281 F.Supp.2d at 724 (citing *Carlisle Area Sch.*

*v. Scott P. By and Through Bess P.*, 62 F.3d 520, 530 (3d Cir. 1995); *Roland M. v. Concord Sch.*
*Committee*, 910 F.2d 983, 992 (1st Cir. 1990), *cert. denied*, 499 U.S. 912 (1991); *Bd. of Educ. of*
*the County of Kanawha v. Michael M.*, 95 F. Supp. 2d 600, 609 (S.D.W. Va. 2000)). Thus, the
administrative officers "erred by regarding any information regarding …[the child's] education
after that date." *Id.*

Consequently here, that determination means looking at the IEP itself (*M.O.*, 793 F.3d at
245), not comparing it to the program at the Winston School. *J.R.*, 345 F.Supp.2d at 395-96;
*Antonaccio*, 281 F.Supp.2d at 724. The only clear argument that Plaintiffs make about why the
Court should reverse the SRO's decision is that the SRO ignored the Winston School's program
and J.R.'s progress there in finding that the 2013-14 IEP was substantively adequate. Plaintiffs
have not pointed to any other evidence, certainly not the evaluative information, indicating that
the IEP's recommended program and placement were not reasonably calculated to allow J.R. to
experience educational benefits or make progress that is appropriate in light of his circumstances
in the least restrictive environment.

Moreover here, the SRO did not "reject a more thorough and carefully considered
decision of an IHO …." *R.E.*, 694 F.3d at 189. In appealing the IHO's decision to the SRO,
Defendant impermissibly argued that the IEP was substantively adequate in comparison to the
Winston School's placement for J.R. The IHO should have rejected this argument as legally
improper. Instead, the IHO rejected it on the merits, finding that "that the Winston School
program is distinctive and in no way comparable to a public school program and the student's
progress in that program does not support a conclusion that he would progress in the very
different program proposed by the CSE …." (IHO Findings of Fact and Decision 9.) Again, the

issue is not whether the IEP proposed a program and placement that was similar to or better than the Winston School's program and placement for J.R.

The IHO also concluded that the IEP's recommended "pullouts, sometimes twice a day," would aggravate J.R.'s issues with embarrassment and withdrawal and other "social difficulties...." Plaintiffs argue that this conclusion is "intuitively obvious" (Pls. Memo. of Law in Supp. of Their Mot. for Summ. J. 17), yet also argue that the IEP failed to provide enough individualized instruction to J.R. Plaintiffs cannot have it both ways. They cannot argue, on the one hand, that the IHO correctly determined that the recommended individual sessions would aggravate J.R.'s "social difficulties" and, on the other hand, argue that the IEP was substantively defective for failing to recommend individualized instruction. Moreover, although S.F.R. testified that J.R. was embarrassed about being pulled out for individual sessions at WEDS (Tr. at 319), the WEDS reports make no such observation. And it is undisputed that J.R. made progress at WEDS.

Plaintiffs rely heavily on cases that are inapposite. (Pls. Memo. of Law in Supp. of Their Mot. for Summ. J. 25, 26.) In *C.F. v. New York City Department of Education*, the Second Circuit reversed the district court's ruling deferring to the SRO's decision. 746 F.3d 68, 78-82 (2d Cir. 2014). The Court found that the SRO's determination upholding the recommended 6:1+1 placement was against the weight of the evidence, where "all witnesses familiar with [the child] testified that he required a 1:1 placement ...." *Id.* at 81; *see also C.L. v. N.Y.C. Dep't of Educ.*, No. 12 Civ. 1676, 2013 U.S. Dist. LEXIS 3474, at **17, 18, 19 (S.D.N.Y. Jan. 3, 2013) (found the SRO's decision against the weight of the evidence where SRO relied on school psychologist's testimony, who spent 75 minutes observing the child, that a 1:1 placement was too restrictive but the parents' witnesses, who had "extensive experience" with the child, testified

that the child "require[d] 1:1 instruction to learn new skills"). No such evidence has been presented here. The *Frank G. v. Board of Education of Hyde Park* ruling is also inapplicable because the SRO upheld the IHO's decision and the district court and the Second Circuit overturned the SRO's decision based in part on evidence that was not presented to the administrative officers. 459 F.3d 356 (2d Cir. 2006). Here of course, the SRO and IHO disagree. And the Court is upholding the SRO's decision based on the same evidence that was in front of the administrative officers.

Under these facts, the Court cannot "substitute [its] own notions of sound educational policy for those of the school authorities which [it] review[s]." *Cerra*, 427 F.3d at 192 (citing *Rowley*, 458 U.S. at 206). The Court defers to the SRO's determination that the 2013-14 IEP offered J.R. a FAPE because the SRO's determination is supported by a preponderance of the evidence.

## CONCLUSION

For the reasons set forth herein, the Court denies Plaintiffs' motion for summary judgment (ECF No. 19) and grant's Defendant's cross-motion for summary judgment. (ECF No. 23.) The Clerk of Court is directed to close this case.

**SO ORDERED.**

/s/ *Sandra L. Townes*
/ SANDRA L. TOWNES
United States District Judge

Dated: _August    9_, 2017
Brooklyn, New York

47